UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:11-cv-00109-TBR

JAMES MILLEA                                                                Plaintiff

v.

FORD MOTOR COMPANY, *et al.*                                               Defendants


## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant Ford Motor Company's Motions *in Limine* concerning Plaintiff's expert Theodore Zinke. (Docket Nos. 74, 76, 77, 78.) Plaintiff James Millea has responded to these motions. (Docket No. 98.) Defendant has replied. (Docket Nos. 100, 101, 102, 104.) This matter is now fully briefed and ripe for adjudication. For the following reasons and consistent with the below opinion, the Court will **DENY** Defendant's Motions *in Limine* at Docket Nos. 74 and 77. Additionally, the Court will **GRANT** Defendant's Motion *in Limine* at Docket No. 76 and **GRANT in part** and **DENY in part** Defendant's Motion *in Limine* at Docket No. 78.


## BACKGROUND

On July 9, 2010, Plaintiff James Millea was involved in an automobile collision while operating a 2000 Ford Ranger.[1] (Docket No. 1, ¶ 10.) At the time of the automobile collision, that vehicle's airbag deployed. *Id.* Plaintiff Millea alleges he

---
[1] The collision occurred at an intersection in Murfreesboro, Tennessee. According to the Tennessee Uniform Police Traffic Crash Report, a vehicle driven by James C. Coleman struck the 2000 Ford Ranger driven by Plaintiff when Coleman attempted to make a left hand turn.

suffered injuries and damages as a result of this deployment.  Specifically, Plaintiff alleges he sustained third degree burns to his right hand/fingers upon contact with the airbag inflator.  (Docket No. 98, at 1-2.)  There does not appear to be a dispute that these burns were a result of Plaintiff's right hand coming in contact with the driver's side airbag inflator after the collision.  (*See* Docket No. 98, at 2.)

On July 8, 2011, Plaintiff filed his Complaint against Ford Motor Company and several others alleging a breach of the standard of care because the vehicle and the airbag system were defective in that they were negligently designed, manufactured, supplied, sold, advertised, distributed, and marketed by the Defendants.  (*See* Docket No. 1, ¶ 16.)  Specifically, Plaintiff alleges that the airbag deployed "with such force and heat so as to cause severe burns to the consumer and/or user" and that "the Defendants failed to properly instruct as to the use and/or warn all consumers and/or users of all dangers associated with the Vehicle and/or airbag."  (Docket No. 1, ¶ 16.)

STANDARD

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). The Court must determine whether evidence proffered under Rule 702 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. A key consideration is "whether the reasoning or methodology underlying the testimony is sufficiently valid." *Id.* at 592-93. The Supreme Court advises that the inquiry is "a flexible one," and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). But *Daubert* did not impose any new standard, other than that already found in the Federal Rules of Evidence, for the admissibility of the testimony of nonscientific expert witnesses. *See id.*; *see also United States v. Velasquez*, 64 F.3d 844, 850 (3d Cir. 1995) (noting that *Daubert* did not impose a new standard other than what is already set out in the Federal Rules of Evidence "for the admissibility of the testimony of nonscientific experts such as . . . real estate appraisers"); *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1040-41 (S.D.N.Y. 1995) (same).

Despite that there is no "definitive checklist or test" for meeting the standard of Rule 702, *Daubert* laid out a number of factors that typically "bear on the inquiry," including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known

or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94. Although *Daubert* addressed scientific evidence, the Supreme Court in *Kumho Tire Co. v. Carmichael* held that a trial court may consider the *Daubert* factors for all types of expert evidence. *Kumho Tire*, 526 U.S. at 150. Thus, the *Daubert* factors are nonexhaustive and may not be pertinent in cases where "the relevant reliability concerns . . . focus upon personal knowledge or experience."[2] *Id.*; *see also First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001).

The Sixth Circuit has developed further guidance on Rule 702 by recently outlining a number of "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177). Also, if a purported expert's testimony was prepared solely for litigation that may be grounds for exclusion. *Id.* (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)).

---

[2] The Advisory Committee Notes to Rule 702 reinforce this position:

> Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded. *See, e.g.*, American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after *Daubert*, 157 F.R.D. 571, 579 (1994) ("[W]hether the testimony concerns economic principles, accounting standards, property valuation, or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field.").

Fed. R. Evid. 702 advisory committee's note (2000 amend.).

Where the testimony of a proffered expert is challenged for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The Court need not necessarily hold a *Daubert* hearing to determine the admissibility of expert testimony but, nonetheless, must ensure that the disputed testimony is both relevant and reliable. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). Generally, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable," *Kumho Tire*, 526 U.S. at 152; *accord Conwood*, 290 F.3d at 792; *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000), and his decision whether to admit expert testimony is reviewed for abuse of discretion, *see Kumho Tire*, 526 U.S. at 142; *Newell Rubbermaid*, 676 F.3d at 527; *Hardyman*, 243 F.3d at 258; *see also Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citations omitted)).

## DISCUSSION

Defendant Ford Motor Company has made several motions *in limine* regarding Plaintiff's expert Theodore Zinke. (Docket Nos. 74, 76, 77, 78.) The Court will address each of these motions in turn. However, first, a brief summary of Zinke's qualifications, conclusions/opinions, and the methodology used to reach these conclusions/opinions is appropriate. Notably, Zinke holds the opinion that the 2000

Ford Ranger contained a design defect and an alternative design would have prevented the injury to Plaintiff's hand.

I.    Summary of Theodore Zinke's Qualifications and Methodology

    a.    Qualifications

Zinke has a Bachelor of Science and a Master of Science from the University of California Santa Barbara in mechanical engineering.  (Docket No. 97, at 8.)  He previously worked at "Minicars" for four years, which at that time was one of the National Highway Traffic Safety Administration's (NHTSA) prime contractors for safety system development and testing.  *Id.* at 8-9.  After leaving Minicars, he performed private consulting for the NHTSA and worked for Breed Automotive—a major supplier of airbag system components—where he eventually became the director of airbag system designs.  *Id.* at 9.  Among other responsibilities, this position involved getting the airbag module design to work in concert with the seatbelt components.

After leaving Breed in 1991, Zinke went to AVS Technologies.  (Docket No. 97, at 9.)  While at AVS, Zinke continued to do consulting work with Breed and some other automobile manufacturers.  *Id.*  He also became involved in some litigation based work.  *Id.*  In 1999, he formed Automotive Safety Research, which is his current employer.  *Id.*

    b.    Methodology and Conclusions

To form his opinions, Zinke reviewed the materials listed in is expert report.  (Zinke Expert Report, at 2-3.)  This extensive list of materials includes, among others: (1) photos of crash tests performed by the NHTSA of the 2000 Ford Ranger, 2000 Ford Taurus, and 2002 Ford Escort; (2) photos of the subject vehicle, the 2000 Ford Ranger,

after Plaintiff's accident; and (3) a survey of available Ford Ranger cases for the relevant model at NHTSA's National Accident Safety Survey (NASS) database.[3]

Zinke made several conclusions/opinions leading up to his ultimate conclusion that the 2000 Ford Ranger design was defective and an alternative design would have prevented the injury to Plaintiff's hands. These opinions include:

> (1) "To a reasonable degree of scientific probability, Mr. Millea's burn injury occurred as a result of his hand coming in contact with the driver airbag inflator after the collision." (Zinke Expert Report, at 3, 9.)

> (2) "Although the airbag fabric remains between the inflator and an outside object, such as Mr. Millea's hand, it does not provide sufficient insulation to prevent burn injury." (Zinke Report, at 6.)

> (3) The lower airbag cover flap in the subject vehicle caught on the steering wheel rim. This occurrence of the Ranger cover flap "catching on the steering wheel rim and remaining in open condition after deployment is not unusual for this cover design. In a crash test conducted by the NHTSA, the same malfunction was seen in Test 4269, a 35 mph barrier impact." (Zinke Expert Report, at 7.)
> Additionally, "a survey of the available Ranger cases at NHTSA's NASS database query website indicates this malfunction occurs in significant numbers." *Id.* at 8.

> (4) Other airbag cover designs, including two produced by Ford, do not exhibit this potentially dangerous characteristic. In these designs, "the airbag cover flaps close back on each other and in so doing, create a barrier that makes it difficult to come in contact with the inflator." (Zinke Expert Report, at 8.)

---

[3] NASS is an organization which gathers detailed accident data for distribution to those working in automotive safety for purpose of gaining further insight into how safety can be addressed. NASS has a website where individuals can query databases. Zinke testified he queried accidents involving Ford Rangers from model years 1998-2003 in which airbag deployment took place. (*See* Docket No. 97, at 10.) In response to this query, he obtained 229 cases. *Id.* In 29 of those cases it could not be determined whether the lower flap cover had fouled. *Id.* Of the remaining 200 cases, he found that 26 cases contained information indicating the airbag cover had become hung on the steering wheel rim. *Id.*

II.    Defendant Ford Motor Company's Motion *In Limine* to Exclude Any Accident Reconstruction and/or Driver Kinematics Opinions by D. Theodore Zinke at Trial (Docket No. 74)

Defendant moves the Court to bar Plaintiff's expert, Theodore Zinke, from offering opinions on the kinematics/biomechanics of Plaintiff's body movements during the accident including, but not limited to, movements of his right arm and right hand and/or opinions on accident reconstruction. (Docket No. 74, at 1.) Defendant argues that: (1) Zinke was not retained for the purpose of providing this type of testimony and is testifying only as an airbag design expert in this case; and (2) in any event, is not qualified to testify on this matter. (*See* Docket No. 74.) Defendant requests that Zinke's testimony be confined to the area he was retained in for this case: air bag design. (Docket No. 74, at 3.)

Portions of Mr. Zinke's testimony during his deposition are relevant to this issue:

> Q: Will you be expressing opinions about seatbelt use?
> MR. KERRICK (Plaintiff's attorney): He's not formally been retained to express an opinion on the seatbelt issue. Broadhead was. He certainly has some knowledge of those issues. And I mean, I guess to some degree that you all are going to ask him today, he can express those. But he's not been retained to express an opinion as to seat belts.
> Q: Fair to say you would be relying on Mr. Broadhead's opinions on the seatbelt use and you've not been retained to express those seatbelt opinions; your opinions are on the airbag components of Mr. Millea's vehicle; correct?
> A: Right. I was going to say I have an understanding of the seatbelt issue, but that I would be deferring to Mr. Broadhead the—basically the testimony of his seatbelt use.
> Q: Okay. Likewise, you don't expect to be giving any accident reconstruction opinions today?
> A: That would be correct.
> Q: I noted that –
> A: At least not as far as any sort of quantitative reconstruction.

Q:  I noted in your report – I believe it's in your report.  It is in your report – on page 2 you indicated you participated in numerous accident reconstructions?

A:  Yes.

Q:  But that's, again, not within the scope of your retention or the opinions you will be expressing; correct?

A:  Correct.  At least not as of today.

***

Q:  How about biomechanical or occupant kinematics?  It is the same as for accident reconstruction – that that is not an opinion that you've formulated for this case?

A:  Well, I could describe general occupant kinematics.  I haven't attempted to try and essentially quantify kinematics, if that what is you're asking.

***

Q:  Beyond Mr. Millea's interaction with the airbag inflator in this case, are there aspects to his interaction with other vehicle interior components that are relative to your opinions?

A:  Well, not specifically relevant to the issue of the airbag cover.

Q:  That is what I want to focus on.

A:  Sure.

 But I think there is – I mean, I saw – I see injury evidence that say his left hand flailed forward and struck something.  I believe he had a fracture to his left hand.

 There is a fracture on the windshield in the lower left corner that would be consistent with that.  He's got various abrasions that would be consistent with interaction with the airbag.

Q:  But, again, you've not been – I'm sorry.  Go ahead.

A:  I mean, I'm aware of those.  He's got a mark on his hip that would be consistent with the seatbelt use.

 But, as you're stating the question, do those relate specifically to the malfunction of the cover, I would say no.  But they do give me an overall understanding of what took place in the accident.

(Docket No. 106-1, at 52-56.)

Subsequently, Zinke reiterated that "based on [his] experience as a restrain system engineer" he had a "general idea of times during which he would be interacting with certain parts of the vehicle."  (Docket No. 106-1, at 57.)  In referencing the injury over Plaintiff's left hip, Defense counsel asked Zinke:

Q:  That could be consistent with seatbelt use in your opinion; right?

A: I think it is consistent with it.

(Docket No. 106-1, at 59.) Later in the deposition, Zinke noted some preparations that are relevant to his seatbelt opinion:

Q: Did you inspect the seatbelt during your inspection?
A: I did look at the seatbelt.
Q: Did you note any areas on the seatbelt that are relative to your opinions that you've expressed either in your report or that we've talked about so far today?
A: I did note some light striations on some of the hardware.
Q: Do you have a photograph of those light striations that you can show us?
A: Yes. I think we have some photographs of that.
Q: Do you have a set of photographs from your vehicle inspection?
A: Do you want me to take a look at some of the photographs of the belt?
Q: Please take a look and see if you can identify a photograph of the light striations that you're referring to.
A: 82 is one such photo. That is a photo of the latch plate.

***

Q: We've got each of those photos where you've circled the D-ring there.

And is it your opinion that those striations on the D-ring are evidence of crash loading in this case?
A: They may be. But that is not—that's not going to be my area of testimony in this case.
Q: Well I'm wondering about which of these photos – what I'm trying to get to is what areas of the seat belt were relative to your opinions that you noted during your inspection?
A: Well, it was relative that I saw some striations, light striations, on the seat belt.
Q: And maybe I misunderstand.

But, if those light striations that you've just identified on Exhibit 32 are not evidence of crash loading, then in what way are they relevant to your opinions?
A: At the time I saw it, my feeling was that it could be relevant to crash loading. The belt – at the time I saw the vehicle, the vehicle was on sort of an angle. So the belt would not extract.
Q: It was parked on an incline?
A: Right.
Q: The retractor was locked?
A: So my thought was originally – originally, I didn't think seat belt usage was an issue in this case.

Q:  For what reason?
A:  Because he's got – you've got the police report indicating belt use.  I believe you have – my understanding is you have a DMV report indicating belt use.  You've got a contusion on his left hip that looks to be consistent with seat belt use.

      And essentially my assignment, what I was asked to focus on was really the airbag and the performance of the airbag module and how that related to the burns on his fingers.  So although I did take some photographs of the seatbelt, that was not my primary focus.

***

Q:  Do you have sufficient experience and training to express expert opinions on seat belt use?
A:  Yes.

(Docket No. 106-1, at 108-113.)

In summary, Zinke stated that he would not be testifying about and was not retained to give opinions on accident reconstructions or the kinematics/biomechanics of Plaintiff's body movements during the accident.  (*See* Docket No. 74-1.)  Zinke's expert report did not contain/disclose any opinions on formal accident kinematics and Plaintiff admits Zinke did not do a detailed accident reconstruction or a detailed analysis of biomechanical or occupant kinematics.  Specifically, Zinke testified that he only had general opinions and had not "quantitatively" analyzed these areas.  (*See* Docket No. 106-1, at 56-59.)

However, Zinke testified that he "could describe general occupant kinematics," even though he hadn't attempted to quantify it, based on his experience.  He also stated that based on his experience as a restraint system engineer he had a "general idea of times during which he [Plaintiff] would be interacting with certain parts of the vehicle." (Docket No. 106-1, at 57.)  Specifically, he stated his opinion was that Plaintiff's injury on the left side of his hip was "consistent with seatbelt interaction." (Docket No. 106-1,

at 58.) Plaintiff argues Zinke has the education, training, and experience to express such opinions and can do so generally in this case. (Docket No. 97, at 12.)

The Court finds that, while Zinke was not retained to give testimony about and did not include opinions on accident reconstruction or kinematics in his expert report, he is qualified to speak about this topic generally and his general opinions on these subjects were given and discussed in his discovery deposition. Additionally, these areas help to inform/supplement his opinion on the airbag design. Furthermore, much of what he would testify about in these areas appears to be insignificant and undisputed—with the exception of his opinion that Plaintiff was wearing his seatbelt and the injury over the left side of Plaintiff's hip is consistent with seatbelt interaction.[4] (*See* Docket No. 106-1, at 59.) Although it appears Plaintiff has retained another expert, William Broadhead, to speak on the seatbelt issue, the Court finds that Zinke is qualified to generally testify on the seatbelt issue. His background, including over 35 years of experience designing and analyzing occupant restraint systems, and preparation, including an inspection of the seatbelt and a review of photographs of the seatbelt and Plaintiff's injuries, qualifies him to give these general opinions. However, his testimony is limited to the opinions stated in his report or deposition. Accordingly, Defendant Ford Motor Company's Motion *in Limine* to exclude any accident

---

[4] Notably, it appears Defendant Ford made whether Plaintiff was wearing a seatbelt an issue *after* disclosure of Zinke's opinion. However, in any event, Zinke is qualified to generally express his opinion on the seatbelt issue and this opinion was discussed in his discovery deposition.
  Defendant argues that under Federal Rule of Civil Procedure 26(a)(2)(B)(i) Zinke's expert report was required to contain "a complete statement of all opinions the witness will express and the basis and reasons for them," and that Zinke's report failed to comply. However, for the reasons discussed above, the Court finds Zinke will be permitted to testify as to his general opinions in these areas. The Court notes that Zinke's general opinions and his basis for them were disclosed and discussed during the discovery deposition, which eliminates any potential prejudice to Defendant. If Defendant wishes, the Court will order Zinke to supplement his expert report to reflect his opinions on accident reconstruction, body kinematics, and the seatbelt issue.

reconstruction and/or driver kinematics opinions by Theodore Zinke at trial is **DENIED**. (Docket No. 74.)

III. Defendant Ford Motor Company's Motion *In Limine* to Exclude Alternative Design Opinion Testimony of Theodore Zinke (Docket No. 76)

Defendant Ford Motor Company moves the Court to exclude Zinke "from offering any opinion testimony at trial about alternative designs for the airbag cover on the subject 2000 Ford Ranger, including, but not limited to, any opinion that Mr. Millea's hand would not have been burned if the lower air bag cover of the 2000 Taurus or 2002 Escort had been used in the subject 2000 Ranger." (Docket No. 76, at 1.) Defendant argues that: (1) Plaintiff failed to timely disclose any opinion of Zinke that had the Taurus or Escort air bag covers been used it would have blocked Plaintiff's right hand from contract with the heated inflator; and (2) Zinke's opinion does not meet the evidentiary reliability and relevance standards enunciated in *Daubert*. *Daubert*, 509 U.S. 579 (1993).

a. First Argument – Failure to Timely Disclose

As for the first argument, Defendant alleges that Zinke's expert report doesn't disclose the opinion/theory that Plaintiff Millea's hand would not have been burned if the lower air bag cover of the 2000 Taurus or 2002 Escort had been used in the subject 2000 Ranger. (Docket No. 76, at 2.) While true that the report does not explicitly state this, it is clearly implied by the heading "Alternate Designs" and the summary underneath that states, in part, the 2000 Taurus and 2002 Escort models "do not exhibit a propensity to catch on the steering wheel rim." (Zinke Expert Report, at 8.) The general thrust of Zinke's opinion was always that the design of the Ford Ranger

increased the risk of a passenger being burned by the airbag inflator. Given this opinion and his statement in the report that the 2000 Taurus and 2002 Escort "do not exhibit a propensity to catch on the steering wheel rim," it should not come as a surprise that he holds the opinion that had these alternative designs been used it would have prevented the burn to Plaintiff's right hand.[5] Furthermore, his deposition made it clear that he held this opinion. Therefore, Defendant's argument that Plaintiff failed to timely disclose this particular argument of Zinke has no merit and was based on a very narrow reading of his expert report. [6]

b. Second Argument - *Daubert*

Defendant argues that Zinke is not qualified under *Daubert* because:

> He has not applied reliable methodology to reach the opinion he
> espouses in this case regarding an alternative design for the airbag
> cover and the fact that he believes they would have prevented Mr.
> Millea's right hand burn within a reasonable degree of engineering
> probability. He did not apply any specialized, scientific, or
> technical knowledge to reach his conclusions; he based his
> alternative design theory on hearsay and dis-similar pictures of
> other accidents he claims are similar to the subject incident, he
> failed to sufficiently connect the facts of this case with his
> alternative design to demonstrate that the alternative design for the
> airbag cover would have prevented the plaintiff's right hand burn,
> and his speculative testimony is not relevant as it would not be
> helpful to the jury.

---

[5] Defendant has also emphasized Zinke did not testify that he holds this particular opinion—that the alternative design would have prevented Plaintiff's right hand burn—"within a reasonable degree of engineering probability." (Docket No. 76, at 2-3.) The Court notes that, although Zinke did not explicitly state he held this opinion to a reasonable degree of engineering probability, courts have been careful to refrain from making the use of this type of phrase a basis for exclusion. *See, e.g., Schultz v. Celotex Corp.*, 942 F.2d 204, 208 (3d Cir. 1991); *United States v. Cyphers*, 553 F.2d 1064, 1072-73 (7th Cir. 1977).

[6] The Court notes that Defendant has also argued Plaintiff now claims Zinke has an opinion on the "rate at which flaps may return to a protective position" and that this opinion has not been disclosed. (Docket No. 100, at 9.) Accordingly, Defendant asks the Court to exclude this testimony. It does appear that Zinke has a general opinion on this issue and it was not explicitly disclosed in his expert report. However, this opinion was discussed in his deposition and the Court believes that it is necessarily implicit in Zinke's overarching opinion that the alternative design would have prevented Plaintiff's injury to his hand—in that if the flaps would not close quickly enough then the injury couldn't have been prevented.

(Docket No. 76, at 4.)  Defendant makes several arguments for why Zinke's testimony is unreliable.  (*See* Docket Nos. 76, 100.)  One argument is that Zinke failed to explain or determine how the alternate design actually works.   In particular, Defendant emphasizes Zinke only looked at photographs of the flap on the design of the 2000 Ford Ranger and the alternative designs at some point in time after the air bags deployed and concluded that the alternative design covers the inflator significantly better than the 2000 Ford Ranger design.  Defendant also points out that Zinke cannot be sure of the exact position of the air bag flap covers or the position of the steering wheel after the accidents.  Additionally, Defendant argues that Zinke cannot produce any evidence that if the lower air bag cover flap had not been caught on the steering wheel after the accident Plaintiff would not have been burned.

Zinke's deposition contains his purported basis for his alternative design opinion:

> A:  The basis for my opinion that these are better designs are basically the NHTSA tests and post-test photographs showing that the covers tend to come back to their original position.  I mean, they don't – obviously the covers can't come completely back to their original position because you've got the airbag hanging out. But they do to a large extent, a much larger extent obviously, than the subject vehicle.

(Docket No. 106-1, at 138-39.)  Essentially, Zinke's basis for his opinion that the airbag cover flaps on the alternative designs, including the 2000 Ford Taurus and 2002 Ford Escort, would have prevented Plaintiff's right hand burn is a review of NHTSA crash test photographs allegedly demonstrating that the lower airbag cover flap does not foul on the steering wheel rim.  (*See* Zinke Expert Report, at 8.)

The Court finds that Zinke's opinion testimony on this issue does not rest on a reliable foundation and, therefore, is properly excluded under *Daubert*. While not exhaustive, several of the factors specifically mentioned in *Daubert* as bearing on the inquiry of reliability of expert testimony are lacking. Zinke's theory has not been tested. *Daubert*, 509 U.S. at 593 (noting ordinarily a key question will be whether a theory or technique can be and has been tested). It also has not been subjected to peer review and publication. *Id.* (noting this is a "pertinent" consideration). Finally, as will be discussed further below, there is a significant potential rate of error given Zinke's use of a very small sample size of photographs when evaluating the alternative design. *Id.* at 594 (instructing courts to ordinarily consider the "known or potential rate of error").

Zinke's only basis for concluding that the alternative design would have prevented Plaintiff from injuring his hand is the review of NHTSA crash test photographs for the 2000 Ford Taurus and 2002 Ford Escort, which allegedly do not show the airbag flap covers getting caught up on the steering wheel rim. However, distinct from his analysis of the Ford Ranger design, Zinke did not examine the NASS database with respect to these alternative designs to determine if the flap hung up on the steering wheel, or at least hung up at a lower rate than with the Ford Ranger. Given that this "fouling" only occurred, by Zinke's own estimate, in 13% of the Ford Ranger cases, it is conceivable that it could occur at the same or even a *higher* rate in the alternative designs—while still not being reflected in the few NHTSA crash test photographs Zinke reviewed. In fact, from a pure probability standpoint, that would be the most likely outcome given the small sample size Zinke employed with respect to these alternative

designs.  *See Daubert*, 509 U.S. at 594 (noting that, in the case of a particular scientific technique, the court should consider the known or potential rate of error).

Zinke's opinion in this regard is close to intuition or speculation.  It is not based on testing, but on a review of a few photographs.  It lacks scientific rigor or methodology.  "A court may conclude there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding district court did not abuse discretion when it excluded expert's testimony).  In summary, Zinke's review of a *few* NHTSA crash test photographs of the alternative designs, as compared to the 200+ photographs he reviewed for the design at issue, does not provide an adequate basis for his opinion the alternative designs would have prevented the injury to make his testimony admissible.[7]

---

[7] In his expert report, Zinke stated that:

> Most airbag cover designs do not exhibit this potentially dangerous characteristic.  In many designs, the airbag cover flaps close back on each other and in so doing, create a barrier that makes it difficult to come in contact with the inflator.  The 2000 Ford Taurus and 2002 Ford Escort are two such cover designs that do not exhibit a propensity to catch on the steering wheel rim.

(Zinke Expert Report, at 8.)  He also explained his opinion in his deposition at various points:

> A:  Well, it goes to a matter how much postdeployment and how much open area is there whereby a person could get some part of their body in and close to the hot inflator.
>
>      With the subject airbag, with a Ranger, with a lower flap hanging up on the steering wheel rim, you're exposing quite a large area that a person could get their hand into.  Whereas with, say, the Taurus, or at least a cover that closes for the most part back down on itself, it's a much smaller area and you've got – and then coming out of that area you've got a huge wad of bag providing protection also.
>
>      So it's all a matter of the degree to which there is open area for someone to be at risk of putting their hand in there or some other body part in there.
>                                          * * *
> Q:  When you say "alternative," are these alternative designs that you would find reasonably safe for their intended use, or, no, they are just alternatives?
> A:  No.  No.  They are alternatives that show a characteristic whereby they provide protection for the occupant against a burn injury from the inflator.  In

Furthermore, Zinke never explained *how* the alternative designs allegedly prevent the airbag cover flap from getting caught on the steering wheel rim. Zinke only generally states that the alternative designs do not exhibit the propensity to get caught up on the steering wheel rim, without offering an explanation for *why* the flaps do not get caught on the rim.[8]

Accordingly, the (1) lack of explanation by Zinke of how the alternative design works; and (2) Zinke's reliance on a very limited sample size of photos of the alternative designs, require exclusion of his opinion that, had the alternative design been used, Plaintiff would not have been injured. Therefore, the Court finds Zinke's opinion that the alternative designs would have prevented Plaintiff's injury is merely speculative and not reliable and will **GRANT** Defendant's motion *in limine*, (Docket No. 76), on this issue.[9] (Docket No. 76.)

IV.     Defendant Ford Motor Company's Motion *In Limine* to Exclude Theodore Zinke's Opinions Regarding NASS Data (Docket No. 77)

Defendant Ford Motor Company moves the Court to exclude Plaintiff's expert, Theodore Zinke, from offering any opinion testimony at trial relying upon or citing his interpretation of NASS data as support for the theory that Plaintiff would not have been

---

other words, the airbag flaps don't hang up on the wheel rim. They tend to come back – try to come back to their original position.

(Docket No. 106-1, at 140, 163-64.)

[8] The closest Zinke comes to providing an explanation is stating: "the airbag cover flaps close back on each other and in so doing, create a barrier that makes it difficult to come in contact with the inflator." (Zinke Expert Report, at 8.) This statement does not explain *what inherent in* the alternative designs prevent the flaps from closing back on each other.

[9] The Court notes that Defendant made several other arguments regarding Zinke's testimony. These arguments include Zinke's silence on the orientation of the steering wheel after the wreck, Zinke cannot determine the speed at which the air bag flaps return to their original position, and Zinke's admission that there was a small possibility that the injury could have still occurred with the alternative design. (*See* Docket No. 100.) The Court declines to address these arguments because, for the reasons discussed above, it finds exclusion of Zinke's testimony is warranted without reaching these arguments.

burned by the airbag deployment if an alternative design had been used.[10]   Defendant

has three primary bases for this motion to exclude: (1) the testing upon which the NASS

data is based was not for the purpose of testing the airbag covers; (2) Zinke's opinion

that the fouling of the airbag flap cover on the steering wheel rim is a common

occurrence and/or is a defect is unsubstantiated; and (3) Zinke's opinions utilizing

NASS data, including photographs, do not meet the evidentiary reliability and relevance

standards in *Daubert*.   (Docket No. 77, at 1.)   Essentially, Defendant's motion is a

generalized attack on the reliability of the NASS data, at least with respect to the

purpose for which Zinke used it.

Defendant emphasizes that Zinke does not know whether the covers were

manipulated after deployment in the NASS photographs.   (Docket No. 77, at 10-11.)

Zinke testified that it was "a possibility" that the cover flaps were manipulated post

deployment because the NASS photographs were taken after the accident actually took

place, but explained why he felt that was very unlikely:

> A:  Well, if there—as I said before, I guess there is a possibility
> somebody could push the cover past the rim and make it foul
> sometime between when the impact took place, when the accident
> took place, and when the investigator got there.
>      But I'd have to think, well, why would they do that and why
> would you see it on 26 out of these 200 cases.  That seems like a
> pretty high percentage that you would have someone who just
> decided, you know, let me push the cover down there, I don't know
> why.  You know, got the bag all wadded up, or maybe it's just

---

[10] NASS is an organization which gathers detailed accident data for distribution to those working in automotive safety for purpose of gaining further insight into how safety can be addressed.  NASS has a website where individuals can query databases.  Zinke testified he queried accidents involving Ford Rangers from model years 1998-2003 in which airbag deployment took place.  (*See* Docket No. 97, at 10.)  In response to this query, he obtained 229 cases.  *Id.*  In 29 of those cases it could not be determined whether the lower flap cover had fouled.  *Id.*  Of the remaining 200 cases, he found that 26 cases contained information indicating the airbag cover had become hung on the steering wheel rim.  *Id.*

hanging out. Why would they do that. And why would you see it at this high a rate?

Q: It wouldn't just be somebody walking by the crash scene and deciding to foul the cover. Right? It would have to be somebody for whom it was in the way; right?

A: Yeah.

Like maybe – I mean, who has access to the vehicle – a tow truck operator or people at the salvage yard. But what would be the purpose –

Q: EMTs. Right.

A: Right.

But the cover is not in the EMT's way. It doesn't benefit the EMT any to move the cover so its hung up on the rim. So I think, really, when you look at it, the likelihood is that is the way it was post accident.

(Docket No. 106-1, at 135-36.) With respect to the 26 NASS cases where the flap was found to be interfering with the steering wheel rim, Zinke explained why he didn't think the NASS investigators purposefully manipulated the covers and that the photo represented the condition the flap was in when the investigator initially saw the vehicle:

Q: Is it possible that some of the lower cover fouling that we see here on those photographs in Exhibit 17 are a result of an investigator moving the lower airbag cover out of the way in order to facilitate his investigation?

A: No. I don't think so on these.

What I do is, when I look at the photographs, first of all, I look at the photographs that were taken from the exterior of the vehicle. And I believe the way the investigators go about this is that they will first photograph the exterior of the vehicle, and then they will begin photographing the interior of the vehicle.

And then they will finally get into more detail as far as pulling the bag out and trying to straighten it out and get a photograph of that. So what I normally do is to look at the photographs from the exterior and look at what the bag looks like from the exterior – has it been wadded up. Is it just hanging out.

And then so – then when I get to the interior photos, if I'm seeing the bag is still in the same situation it was when they photographed the exterior and I see that the cover is hung up, then it's a good likelihood that is the way the cover was when they came upon the vehicle.

There actually were – I think there was maybe one case at least where it appeared the investigator unfouled the cover in order to

get a good close-up shot of the cover. But in cases – I can't remember on this case, but I can tell you on the Chew case there were situations where it looked like the investigator had pushed the cover past the rim in order to be able to get the bag spread out. And I specifically excluded those. Because obviously that is not fair game. So I really did make an effort to try to take those cases where I believe the cover was fouled as the investigator got to it.

(Docket No. 106-1, at 131-32.)

Defendant also appears to take issue with Zinke's methodology. Other courts have recognized that analyses of NASS data are an appropriate basis for proffering expert testimony. *See, e.g., Campbell v. Fawber*, 2013 WL 1330153, at *2-*4, *13 (M.D. Pa. Mar. 29, 2013); *Hernandez v. Ford Motor Co.*, 2005 WL 6240743, at *2 (S.D. Tex. July 20, 2005). This Court finds that Zinke's reliance on the NASS data is appropriate.[11] Defendant's arguments are better suited for attacking the weight and credibility of this evidence and Zinke's opinion—not its admissibility. Accordingly, the Court will **DENY** Defendant's motion *in limine* to exclude Theodore Zinke's opinions regarding NASS data.[12] (Docket No. 77.)

V.   Defendant Ford Motor Company's Motion *In Limine* to Exclude Testimony of D. Theodore Zinke Regarding "Blocking" of the Right Hand or Injury Prevention (Docket No. 78)

Defendant moves to exclude Zinke from testifying that the design of the lower air bag cover flap caused or contributed to causing any injury to the Plaintiff. (Docket No. 78, at 1.) Specifically, Defendant argues: (1) Zinke's opinion that a different design

---

[11] Defendant argues that because Zinke himself did not do the actual analysis of the post-crash condition of the 26 vehicles, but rather he just viewed the photographs of others, it makes this methodology unreliable. While that may be factor that weighs against the credibility or weight of the evidence, the Court does not believe it requires exclusion of this NASS data.

[12] The Court reiterates that, in granting Defendant's motion *in limine* at Docket No. 76, it has excluded Zinke's alternative design opinion testimony. The Court's decision to not exclude Zinke's opinion on the NASS data has no impact on that holding because Zinke's alternative design opinion was not based on NASS data.

of the lower flap of the air bag cover would have prevented Plaintiff's injury was not timely disclosed; and (2) under FRE 702 and *Daubert* his late-disclosed opinions fail to meet the threshold requirements for admissibility in federal court.  (Docket No. 78, at 2.)

As to the first argument, the Court has concluded there was not a lack of timely disclosure in resolving the above motions *in limine*.  As previously stated, the general thrust of Zinke's opinion was always that the design of the Ford Ranger increased the risk of a passenger being burned by the airbag inflator.  Given this opinion and his statement in the report that the 2000 Taurus and 2002 Escort "do not exhibit a propensity to catch on the steering wheel rim," it should not come as a surprise that he holds the opinion that had these alternative designs been used it probably would have prevented Plaintiff's right hand burn.  Furthermore, his deposition made it clear that he held his this opinion.  Therefore, Defendant's argument that Plaintiff failed to timely disclose this particular opinion of Zinke has no merit and was based on a very narrow reading of his expert report.

As to the second argument, Defendant reiterates many of the same objections to Plaintiff's testimony that the Court addressed in resolving the above motions *in limine*, particularly those arguments made in the motion *in limine* at Docket No. 76 objecting to Zinke's alternative design opinion.  (*See* Docket No. 78, at 4.)  With respect to his opinion that the alleged fouling of the air bag flap cover on the steering wheel rim caused the injury to Plaintiff, the Court will permit that testimony.  While Defendant

made many arguments against admission of this testimony,[13] the Court finds these arguments concern the weight of the evidence rather than its admissibility—particularly after taking into account Zinke's expertise/knowledge in this area and the nature of Plaintiff's injury.

However, with respect to the opinion that the alternative design would have prevented the injury to Plaintiff, the Court has already held in granting Defendant's motion *in limine* at Docket No. 76 that this testimony is inadmissible. Accordingly, the Court will **GRANT in part** Defendant's motion *in limine* as to the opinion that the alternative design would have prevented Plaintiff's injury, but **DENY in part** as to the opinion that the fouling of the airbag cover flap on the steering wheel in the Ford Ranger caused Plaintiff's injury. (Docket No. 78.)

## CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Defendant Ford Motor Company's Motions *in Limine* at Docket Nos. 74 and 77 are **DENIED**, Defendant's Motion *in Limine* at Docket No. 76 is **GRANTED**, and Defendant's Motion *in Limine* at Docket No. 78 is **GRANTED in part** and **DENIED in part**; consistent with the above opinion.

IT IS SO ORDERED.

Date:

cc:      Counsel

---

[13] These arguments include that Zinke did not know for sure the orientation of the steering wheel during or immediately after the accident, the ultimate position of Plaintiff's body after the accident in relation to the steering wheel and air bag, and Zinke cannot completely rule out the possibility that the lower air bag cover flap became fouled by interactions with the steering wheel by first responders—not by air bag deployment. (*See* Docket No. 78, at 4-5.)